**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically on November 8, 2016, which may be different from its entry on the record.**

**IT IS SO ORDERED.**

**Dated: November 8, 2016**



ARTHUR I. HARRIS
UNITED STATES BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO

In re:                         )     Case No. 15-14696
                                 )
JAMES P. KEANE,           )
       Debtor.                )     Chapter 7 Proceedings
_____   )
                                   )
SHEEN FALLS STRATEGIES, LLC  )     Adversary Proceeding
DANIEL GEIB, &             )     No. 15-1194
KEVIN MCGINTY           )
       Plaintiffs,          )
                                   )     Judge Arthur I. Harris
v.                            )
                                   )
JAMES P. KEANE,           )
       Defendant.         )

## MEMORANDUM OF OPINION[1]

On November 11, 2015, the plaintiff-creditors, Sheen Falls Strategies, LLC,

Daniel Geib, and Kevin McGinty, filed this adversary proceeding seeking a

determination that three state court judgments entered in their favor and against

---

[1] This Opinion is not intended for official publication.

the defendant-debtor, James Keane, are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), and (a)(4). The creditors allege that the debtor obtained the loans giving rise to the state court judgments by making a number of false or fraudulent statements, including falsely representing that he had a confidential and highly-successful financial formula for buying and selling stock options that he would contribute to their business venture. Following a two-day trial, the Court took the matter under advisement. For the reasons that follow, the Court enters a final judgment as follows: 1) the portion of creditor Daniel Geib's state court judgment reflecting his initial $25,000 loan to the debtor is nondischargeable under § 523(a)(2)(A), but the balance of Geib's state court judgment reflecting Geib's two additional loans to the debtor is dischargeable; 2) creditor Kevin McGinty's state court judgment against the debtor is nondischargeable under § 523(a)(2)(A); and 3) creditor Sheen Falls Strategies' state court judgment against the debtor is nondischargeable under § 523(a)(4).

## JURISDICTION

The Court has jurisdiction over this matter. A determination as to the dischargeability of a particular debt is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This Court has jurisdiction over core proceedings pursuant to 28 U.S.C. §§ 157(a) and 1334 and Local General Order No. 2012-7, entered by the

2

United States District Court for the Northern District of Ohio.

PROCEDURAL HISTORY

This adversary proceeding was preceded by three state court cases filed by Sheen Falls Strategies, Geib, and McGinty respectively, against the debtor in 2014. *Sheen Falls Strategies, LLC v. James P. Keane,* Cuyahoga C.P. No. CV-14-830832 (filed Aug. 5, 2014); *Daniel O. Geib v. James P. Keane,* Cuyahoga C.P. No. CV-14-828549 (filed June 18, 2014); and *Kevin McGinty v. James Keane,* Cuyahoga C.P. No. CV-14-828630 (filed June 19, 2014).

On August 17, 2015, the debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code (Case No. 15-14696). On September 23, 2015, a meeting of creditors was held pursuant to 11 U.S.C. § 341(a), and, on December 28, 2015, the Chapter 7 trustee filed a report of no distribution (Docket No. 31, Case No. 15-14696).

On November 11, 2015, creditors Sheen Falls Strategies, Geib, and McGinty initiated the above-captioned adversary proceeding by filing a complaint alleging that the debtor: (1) obtained money, property, and services of the creditors through false pretenses, false representations, and actual fraud, so the debtor's obligations are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A); (2) made written statements to the creditors that were materially false, reasonably relied on

3

by the creditors, and made or published with the intent to deceive the creditors, so the debtor's obligations are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B); and (3) had a fiduciary obligation to creditors in the formation and operation of their company, and defrauded the creditors by making false and/or misleading statements, so the debtor's obligations to the creditors are nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

On January 20, 2016, the debtor answered the complaint, denying the substantive allegations and asserting affirmative defenses. On May 31, 2016, the debtor moved for summary judgment as to each of the creditors' three counts. In a marginal order entered on August 8, 2016, the Court granted the debtor's motion for summary judgment in part. The Court granted summary judgment in favor of the debtor as to Count Two (fraud based on writing under § 523(a)(2)(B)) and part of Count Three (defalcation under § 523(a)(4)). The Court denied summary judgment as to Count One (fraud under § 523(a)(2)(A)) and part of Count Three (embezzlement and larceny under § 523(a)(4)).

A two-day trial was held on September 7 and 26, 2016, for Count One and the remaining portion of Count Three. The Court heard testimony from plaintiff-creditors Daniel Geib and Kevin McGinty; defendant-debtor James Keane; alleged creditor of the debtor, Cathryn Mooney; potential investor in the company,

4

Dr. Craig Harris; potential investor in the company, Dr. Nuruddin Presswala; and the debtor's wife, Mary Jo Keane. The Court admitted the plaintiffs' exhibits 1 through 11 without objection. The Court also admitted the defendant's exhibits A through HH part 3 without objection. This memorandum constitutes the Court's findings of fact and conclusions of law as required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## FINDINGS OF FACT

The findings of fact contained in this memorandum of opinion reflect the Court's weighing of the evidence, including credibility of the witnesses. "In doing so, the court considered the witnesses' demeanor, the substance of the testimony, and the context in which the statements were made, recognizing that a transcript does not convey tone, attitude, body language, or nuance of expression." *In re Parrish*, 326 B.R. 708, 711 (Bankr. N.D. Ohio 2005). Even if not specifically mentioned in this decision, the Court considered the testimony of all the trial witnesses and exhibits admitted into evidence. Unless otherwise indicated, the following facts were established at trial by a preponderance of the evidence.

The three state court judgments at issue in this dischargeability action all arose out of a failed business venture. In 2011, creditor Daniel Geib was looking

for an alternative investment for some of his money. At a social event, the debtor told Geib about an investment opportunity using a trading model for stock options developed and tested by the debtor. The debtor and Geib had known each other for over ten years and were friends. The debtor claimed that the model had produced 24 percent returns each year during testing. At the debtor's invitation, Geib went to the debtor's home office multiple times to see the model, including once with Geib's friend, Mike Ward, who ended up being the company's attorney. The debtor was protective of the model but still gave Geib a binder of printouts from TradeStation and Wikipedia describing the indicators that the model used. The contents of the binder are reproduced in Exhibits J and K possibly with some additional material. The printouts do not include any original work created by the debtor. The debtor led Geib to believe that there was more to the model than just these printouts – something that the debtor had developed himself. Convinced by these meetings, Geib opened a TradeStation account with $50,000 on July 11, 2011, and authorized the debtor to make trades on his behalf. In October 2011, Geib reported to the debtor that Geib's TradeStation account had outperformed Geib's investment in a multi-manager fund. However, Geib testified that, later on, he was upset with the debtor's infrequent trading and losses experienced in early 2012.

6

Despite this dissatisfaction with the debtor's frequency of trading, Geib approached his friend, creditor Kevin McGinty, to suggest that McGinty meet with the debtor and open his own account at TradeStation for the debtor to trade. McGinty had over 25 years of experience in institutional investing with major firms but no experience in trading stock options. Geib introduced McGinty to the debtor, and the debtor showed McGinty the model with Geib. Based on the alleged 24 percent annual returns reaped during testing and the positive returns in 2011, Geib wanted the debtor to trade on behalf of more people. The debtor explained that they would need to be licensed if they were to trade on behalf of a large number of people. The three friends decided they should form an LLC and solicit business from family and friends. On February 23, 2012, McGinty opened his own TradeStation account and authorized the debtor to make trades on his account. Over the next three years, the debtor only made two trades on McGinty's account. The parties did not establish when these two trades were made.

In early 2012, Geib, McGinty, and the debtor worked together to launch their new company. The debtor donated the model as his investment, and Geib and McGinty each invested $40,000 in the company. Their plan was to solicit investors with high net worth. The plan required trust and faith in the model, which Geib testified that he had at this point based on the performance of his

7

account and the debtor's assurances. After the debtor's first seven months of trading on Geib's account, Geib saw a 2.6 percent gain in his TradeStation account. On March 5, 2012, Geib sent an email to McGinty and the debtor reporting this gain over the period of July 31, 2011, to February 29, 2012. The debtor had made 155 trades, averaging out to about one trade every two days. Geib testified that he understood that on days when the market did not move trading was not profitable. This 2.6 percent gain was nowhere near the anticipated return of 14 percent for seven months.

During the initial development of the company, the debtor asked for compensation for previously testing the model and funds for living expenses. The debtor also told Geib and McGinty that he needed funds for his TradeStation account. In March 2012, Geib and McGinty each loaned the debtor $25,000 for a total of $50,000. In an email on March 8, 2012, Geib wrote that they agreed to loan the debtor $25,000 each with a "term of 20 months with principal and interest at 5 percent with payments of $7,500 to begin quarterly in 2013 and into 2014 if necessary." Geib wrote that the loan would be personal and the debtor could repay the loan with his share of the management fees earned through the company. However, at trial, Geib testified that the terms of the agreement changed after this email in that the debtor was supposed to repay this first loan using his monthly

8

social security payments. Geib further wrote in the email, "The loan program was my thought based on our conversation to try and get [the debtor] out of the woods now so we can move forward." The loans would allow the debtor to focus his full attention on daily trading and future growth of the company. Geib wrote, "This way [the debtor] can clear out his current debts and not have to worry about them."

On April 3, 2012, the State of Ohio certified that the articles of organization for the company called Sheen Falls Strategies, LLC, were on file. Over the next year, the parties continued to develop their business together. Together, the parties created a business plan, brochure, and other materials. The Sheen Falls Strategies business plan dated February 2013 described the model as the following:

> The main indicator is a Computer Generated Trend Line (CGTL) based on a centered fulcrum that is determined by the given time frame being used; best used in real-time. The line utilizes parameters known and available to anyone using commercial and consumer trading software. The unique combination of the indicators performance along with their interpretation is the principle that makes their line distinctive to LLC. This distinction has the potential to lead to proprietary use and patent of these indicators and trademark of its name.

The final sentence of the description supports Geib and McGinty's claims that the debtor presented the model as something more than just compiling different indicators to predict the market. The debtor presented the model as

something unique that had the potential to lead to proprietary use and patent when, at most, it was actually just the combination of certain indicators provided by TradeStation.

In the business plan, they described the company as "a small company created by three friends to test trading theory." They also created their initial goals for the company. They sought to open 25 accounts by the end of June 2013, 50 by the end of 2013, and 50 more in 2014. In addition, the parties leased an office in Rocky River for the company in March 2013.

In 2012 while the parties were developing the business, the debtor did not trade frequently, and Geib continued to express his displeasure with the lack of trading. Geib said the debtor was out golfing and vacationing instead of trading for the company.

In March 2013, the debtor asked for additional loans instead of making his first scheduled quarterly repayment of $7,500 on the original $50,000 in loans. Geib testified that the debtor claimed he should be compensated for his trading while they were developing the business but before they were making profits on accounts. Even though Geib was dissatisfied with the debtor's lack of trading, Geib still loaned the debtor an additional $10,000 in March 2013. McGinty would not lend the debtor more money. At that point in the year, the debtor had only

10

made one trade in Geib's account and no trades in McGinty's account. Geib told the debtor he needed to prove that the model worked before Geib would advance him any additional funds.

In April 2013, the debtor and McGinty met with Anne Followell, the licensing chief counsel for the Ohio Department of Commerce. The debtor testified that Followell told them that they were not allowed to trade on behalf of others until the company was licensed. Geib confirmed in his testimony that the debtor was concerned about trading for others after they formed the company when he did not have approval from the State of Ohio.

The debtor made one trade in April 2013. Despite this lack of activity, the debtor continued to ask Geib and McGinty for more money. In June 2013, Geib loaned the debtor an additional $15,000 even though the debtor still had not proved the model worked. This third loan from Geib came after the debtor made no trades in May or June. Again, McGinty would not lend the debtor anymore money. Continuing the trend of inactivity, the debtor made no trades in July. In August, the company received its licensing from the State of Ohio and was approved to trade on behalf of others. The debtor still did not make any trades in August.

Geib testified that after the inactive 2013 summer, he realized that the

debtor was not the best person to implement the model. In August, the debtor

continued to ask for more money in loans. In an email to McGinty on

August 6, 2013, Geib wrote:

> [The company] will need funds immediately to continue to operate. I
> cannot wait until September 30 or early October for your
> participation. If we are going to continue as a group [then] you need
> to commit to the equity investment, and prepare to deposit your funds
> this week. The longer we wait the deeper we are digging the hole. If
> I need to look for another investor to spread the risk please make your
> decision now and not in October and inform me in writing. I am as
> comfortable with the model as you are, so now it's time to make a
> firm commitment. You have had every opportunity to check things
> out, and [do] your research of the model and business plan. You
> should have all the detailed information you need to make your final
> decision. Let me know what you decide this week.

McGinty responded by writing that he was committed to the investment but

was working on accessing capital to fund the second loan to the debtor. Three

days later, the company itself loaned the debtor $50,000 according to the

promissory note signed by the debtor. The note outlined that the debtor would

repay the loan in installments of $10,000 beginning on or about

December 31, 2013. In addition, the note stated that the loan was for commercial

or business purposes, and was not intended and would not be used for personal,

family, household, educational, consumer, or agricultural purposes. Geib and

McGinty both testified credibly that the purpose of the $50,000 loan from the

12

company to the debtor was to enable the debtor to fund and presumably profit from trading on his own TradeStation account. At this point, the debtor still had not made any more trades in Geib's account since April. The debtor also was not trading McGinty's account.

Despite the debtor's inactivity, development of the company continued. The parties added the following sentence to the company's brochure in August: "Due to the nature of our proprietary model, clients are made aware of our specific investment strategies." This statement perpetuated the idea that there was something unique about the model beyond simply using eight indicators to predict the market. Geib and McGinty did not establish that the debtor personally added this statement to the brochure, but the debtor was aware of this statement and did not dispute this statement.

After receiving the additional $50,000 loan and the license in August 2013, the debtor started occasionally trading Geib's account again in September 2013. The debtor still did not make any trades on McGinty's account. In an email to all parties on October 16, 2013, Geib wrote there is "no need to be inactive with this model in such a volatile market. If this model is truly a non-correlated investment vehicle, [the company] should have been trading profitably all throughout this roller coaster ride over the past few weeks." Geib further asked the parties to

13

work on their individual job descriptions and come to a meeting prepared to discuss their specific roles.

On October 19, 2013, Geib sent an email to the parties summarizing the model's simulated trading activity from 2008 through 2013 as provided by the debtor to inform future client conversations. He listed a 22.6 percent return per year, with an average of 145 trades per year. That averaged to roughly one trade every three days – not daily trading like the debtor had represented. During 2013, the debtor only made about 50 trades in Geib's account. The debtor made one trade in January, one trade in April, and then the rest of the trades starting on September 20, 2013. These trades netted $800 for the year – an increase of roughly 1.6 percent. Over the three years that the debtor traded Geib's account, the debtor did not produce yearly returns of more than 2 percent. These real returns were much lower than the alleged returns for the simulated account.

At the end of 2013, the debtor made a $7,500 repayment on the two original loans totaling $50,000 from Geib and McGinty. The debtor was supposed to have made four quarterly repayments of $7,500 in 2013 on the two original loans. In addition, the debtor was supposed to make a $10,000 payment at the end of 2013 on the $50,000 loan from the company.

During the development of the business, animosity arose between the debtor

14

and McGinty.  While McGinty was in the office with the debtor, McGinty grew frustrated when the debtor did not make trades despite McGinty seeing opportunities to trade.  McGinty said he became visibly annoyed with the debtor. McGinty became more vocal about the debtor's lack of trading on McGinty's account and his minimal trading on Geib's account.  Due to the conflict, McGinty claimed that the debtor came to the office less frequently to avoid McGinty.  In late 2013, the debtor spoke with Geib about buying out McGinty.  The debtor went so far as to meet with potential investors to buy out McGinty.  Dr. Craig Harris was one of the potential investors.  However, the buyout never went forward.

On January 22, 2014, McGinty sent an email to the parties expressing his concerns about the debtor's lack of frequent trading, explaining his own absence from the office, and asserting that he "knew the model well enough" to sell it and raise assets.  He wrote that the "model works, but has to be acted upon to be successful."  Exhibit Y.  He also wrote, "We all know that a somewhat consistent 2 percent net return would be plenty of reason enough to start to raise assets for this type of alternative investment."  Exhibit Y.  The debtor made no trades after February 7, 2014.

On May 14, 2014, Geib and McGinty met and terminated the debtor's membership rights in the company.  In the minutes from this meeting, Geib and

15

McGinty listed thirteen grounds for removing the debtor from the company. These grounds included "failure to completely transfer the [model] to the company and to confirm the company's proprietary rights in the [model]" and "failure to disclose and confirm the operation of a functional [model]." McGinty testified at trial that he no longer believed that there ever was a proprietary model. He had seen models like the debtor's before where someone opened up an account with a firm that provides technical charts and information. The use of those technical charts is not a proprietary model. On May 16, 2014, Geib and McGinty wrote the debtor to inform him that his membership rights had been terminated pursuant to the company's operating agreement.

In June 2014, Geib and McGinty filed separate lawsuits in the Common Pleas Court of Cuyahoga County against the debtor. On June 19, 2014, the Common Pleas Court entered a judgment in favor of McGinty in case no. 14-828630 for $25,000 and interest at 10 percent from March 31, 2012. On December 3, 2014, the Common Pleas Court entered a judgment in favor of Geib in case no. 14-828549 for a total of $47,871.53 and interest at 10 percent from December 3, 2014. The state court broke down the judgment in favor of Geib in the following way:

> 1) Counts 1 & 4: $22,871.53 at 10 percent from November 9, 2012;
> 2) Counts 2 & 5: $10,000 at 10 percent from March 14, 2013; and
> 3) Counts 3 & 6: $15,000 at 10 percent from June 1, 2013.

16

In addition, a third lawsuit was filed on behalf of the company against the debtor in August 2014. On August 5, 2014, the Common Pleas Court entered a judgment in favor of the company in case no. 14-830832 for $50,000 at 12 percent interest from January 10, 2014.

In the course of pursuing these judgments, the creditors discovered the identity of one of the debtor's other creditors, Cathryn Mooney. Mooney had been friends with the debtor and his wife for over twenty years. In March 2011, Mooney gave the debtor $50,000. The debtor and his wife testified that the $50,000 was a loan. Mooney testified that the debtor was supposed to invest the $50,000 using his formula. Either way, the debtor did not invest the $50,000 for Mooney, nor did he repay the $50,000 as if it were a loan.

CONCLUSIONS OF LAW

I. Nondischargeability

The creditors ask the Court to determine that the debts owed to them by the debtor as determined by the state court judgments are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), and (a)(4). The Court already granted summary judgment in favor of the debtor as to 11 U.S.C. § 523(a)(2)(B) and the defalcation portion of 11 U.S.C. § 523(a)(4), and the Court need not address those claims further.

In seeking an exception to discharge, a creditor bears the burden of proof by

17

a preponderance of the evidence. *See Rembert v. AT&T Universal Card Servs.*

*(In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir. 1998). Discharge exceptions are

to be strictly construed in favor of the debtor. *Id.*

### A. Nondischargeability under 11 U.S.C. § 523(a)(2)(A)

Section 523 provides in pertinent part:

(a) A discharge under section 727. . . of this title does not discharge an
individual debtor from any debt –
. . . .
(2) for money, property, services, or an extension, renewal, or
refinancing of credit, to the extent obtained by –
(A) false pretenses, a false representation, or actual fraud, other
than a statement respecting the debtor's or an insider's
financial condition. . . .

In order to except a debt from discharge under § 523(a)(2)(A), a creditor must

prove the following elements: (1) the debtor obtained money through a material

misrepresentation that, at the time, the debtor knew was false or made with gross

recklessness as to its truth; (2) the debtor intended to deceive the creditor;

(3) the creditor justifiably relied on the false representation; and (4) its reliance

was the proximate cause of the loss. *See In re Rembert*, 141 F.3d at 280-81

(6th Cir. 1998).

First, the creditors must prove that the debtor obtained money by false

pretenses, a false representation, or actual fraud, other than a statement respecting

the debtor's or an insider's financial condition. The Supreme Court held that the

18

term "actual fraud" in § 523(a)(2)(A) includes fraudulent schemes even when those schemes do not involve a false representation, such as a fraudulent conveyance of property made to evade payment to creditors.

*Husky Intern. Electronics, Inc. v. Ritz*, 136 S. Ct. 1581, 1590 (2016).

The creditors must prove that, at the time, the debtor knew the material misrepresentation was false or made with gross recklessness as to its truth. A material misrepresentation is defined as "an expressed misrepresentation." *Wings & Rings, Inc. v. Hoover (In re Hoover)*, 232 B.R. 695, 700 (Bankr. S.D. Ohio 1999) (citing *Hile v. Lewis (In re Lewis)*, 164 B.R. 588, 591 (Bankr. N.D. Ohio 1994)). Alternatively, § 523(a)(2)(A) also covers money obtained through false pretenses or actual fraud. False pretenses involve "an implied representation or conduct that is intended to create and foster a false impression." *Id*. Actual fraud is a broader concept that has been defined as "any deceit, artifice, trick or design involving a direct and active operation of mind, used to circumvent and cheat another – something said, done or omitted with the design of perpetrating a cheat or deception." *Coughlin Chevrolet, Inc. v. Thompson (In re Thompson)*, 458 B.R. 409, 421 (Bankr. S.D. Ohio 2011).

Ohio law imposes a duty to disclose material information "when one party has information that the other [party] is entitled to know because of a fiduciary or

19

other similar relation of trust and confidence between them." *State v. Warner*, 55 Ohio St. 3d 31, 564 N.E.2d 18, 40 (1990) (quoting *Chiarella v. U.S.*, 445 U.S. 222, 228 (1980)). *See also* Restatement (Second) of Torts § 551(2)(c) (1977) (stating that a party to a business transaction has a duty to disclose "subsequently acquired information that he knows will make untrue or misleading a previous representation"). The Supreme Court of Ohio held that:

> A party is under a duty to speak, and therefore liable for nondisclosure, if the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another party to act or refrain from acting, and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading.

*Miles v. Perpetual Savings & Loan Co.*, 58 Ohio St. 2d 97, 100 N.E.2d 1367, 1369 (1979).

The Sixth Circuit held that under Ohio law, "courts treat the fiduciary duties owed by members in a limited liability company as substantially the same as those owed by partners in a partnership." *Academic Imaging, LLC v. Soterion Corp.*, 352 Fed. Appx. 59, 68 (6th Cir. 2009) *citing McConnell v. Hunt Sports Enters.*, 132 Ohio App. 3d 657, 725 N.E.2d 1193, 1215 (1999). This fiduciary relationship "imposes on the members a duty to exercise the utmost good faith and honesty in all dealings and transactions related to the company." *Blair v. McDonagh*, 177 Ohio App. 3d 262, 894 N.E.2d 377, 387 (2008).

20

Section § 523(a)(2)(A) expressly excludes all statements respecting a debtor's financial condition, whether written or oral, as a basis for nondischargeability. *Prim Capital Corp. v. May (In re May)*, 368 B.R. 85 (Table), *6 (B.A.P. 6th Cir. 2007). A debt based upon an oral misrepresentation of financial condition is not actionable and will be dischargeable. *In re May*, 368 B.R. 85.

The Code does not define the phrase "respecting the debtor's . . . financial condition," leaving the phrase open to interpretation. The Court of Appeals for the Sixth Circuit has not directly addressed this issue. The Sixth Circuit has, however, implied that statements showing a debtor's net worth are statements respecting an individual's financial condition. *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 89-90 (6th Cir. 1993). Few circuit courts have directly addressed this issue, but two views have emerged on the proper interpretation of the phrase. The "broad interpretation" adopted by the Fourth Circuit includes any communication that has a bearing on the debtor's financial position. *Engler v. Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060 (4th Cir. 1984). In other words, any communication addressing the status of a single asset or liability qualifies. *See Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 705 (10th Cir. 2005). On the other hand, the "strict interpretation," adopted by the

21

Eighth and Tenth Circuits, limits statements respecting the debtor's financial condition to communications that purport to state the debtor's overall net worth, overall financial health, or equation of assets and liabilities. *See id.* at 705. *See also Rose v. Lauer (In re Lauer)*, 371 F.3d 406, 413-14 (8th Cir. 2004) (providing support for the strict interpretation).

The Bankruptcy Appellate Panel of the Sixth Circuit adopted the strict interpretation. "The strict interpretation, limiting statements concerning the debtor's financial condition only to those that actually claim to state the debtor's overall financial health, net worth or assets and liabilities, is most consistent with the text and structure of the Bankruptcy Code." *In re May*, 368 B.R. 85 at *6. The Panel found that the following three oral statements that the debtor allegedly made to the creditor were not related to the debtor's financial condition: (1) that the debtor needed the loan to satisfy a large tax assessment; (2) that the debtor would be able to repay the loan with proceeds from an expected large settlement; and (3) that the debtor promised to pledge his own house as collateral. *In re May*, 368 B.R. 85 at *7.

The second element that the creditors must prove is the debtor's intent to deceive the creditors. Whether a debtor possessed an intent to defraud a creditor within the scope of § 523(a)(2)(A) is measured by a subjective standard.

22

*In re Rembert*, 141 F.3d at 281.  To prove intent, the creditor must show "actual or positive fraud, not merely fraud implied by law," meaning that the debtor must have acted "maliciously and in bad faith."  *Id*. at 281.  A debtor's intention must be ascertained by the totality of the circumstances.  *Id*. at 282.  A debtor subjectively intends to defraud a creditor when he in bad faith incurs a debt with the knowledge that the debt is unlikely to be repaid.  *Id*. at 281.

> As the Supreme Court noted in reference to common law fraud:
>
> [T]he intent which must be established need not be an intent to cause injury to the [appellee]. . . . [I]t is not necessary that the person making the misrepresentations intend to cause loss to the other or gain a profit for himself; it is only necessary that he intend action in reliance on the truth of his representations. . . . [T]he fact that the defendant was disinterested, that he had the best motives, and that he thought he was doing the plaintiff a kindness, will not absolve him from liability so long as he did in fact intend to mislead.

*S.E.C. v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 192 n.39 (1963).

Third, the creditors must prove that they justifiably relied on the false representation.  Justifiable reliance is a less demanding standard than reasonable reliance.  *Field v. Mans*, 516 U.S. 59, 71 (1995) (explaining the difference between justifiable reliance and reasonable reliance under the common law, citing extensively the Restatement (Second) of Torts).  A creditor may be justified in relying on a representation even if "he might have ascertained the falsity of the representation had he made an investigation."  *Field*, 516 U.S. at 70.  The creditor,

23

however, cannot turn a blind eye where a "patent" falsity could be determined by a "cursory examination or investigation." *Id.* at 71.

The Restatement (Second) of Torts gives the example of a seller of land who says the land is free of encumbrances. According to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have "walk[ed] across the street to the office of the register of deeds in the courthouse" and easily have learned of an unsatisfied mortgage. *Field*, 516 U.S. at 70 (*quoting* Restatement (Second) of Torts, § 540 (Am. Law Inst.1976)). Although the buyer's reliance on the misrepresentation must be justifiable, his conduct does not need to conform to the standard of the reasonable man. *Id.* at 70-71. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases. *Id.* at 71. For example, the relationship between the debtor and the creditor factors into justified reliance. A debtor can take advantage of his friendship with a creditor and misuse the trust associated with their relationship. *Heide v. Juve (In re Juve)*, 761 F.3d 847, 853 (8th Cir. 2014).

Justifiability is not without some limits. The creditor cannot have justifiable reliance if the misrepresentation should be apparent to a person of the creditor's knowledge and intelligence from a cursory glance. *Field*, 516 U.S. at 71. For

24

example, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has only one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. *Id.* at 71. Still, the creditor must be capable of appreciating the falsity of the misrepresentation. Thus, a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses. *Id.* at 71.

The creditor is also required to make a more substantial investigation when the creditor discovers a red flag that should warn him that he is being deceived. *National City Bank v. Holmes (In re Holmes)*, 414 B.R. 115 (E.D. Mich. 2009). *See also Posen v. Scialdone (In re Scialdone)*, 533 B.R. 53, 62 (Bankr. S.D.N.Y.) (Once would-be investors discovered that the debtor had supplied them with an inaccurate tax return, they could no longer simply rely on the debtor's explanation for the inaccuracies without making their own independent investigation.)

Another red flag is the reluctance of fellow creditors to invest. For example, a court found no justifiable reliance when a creditor insisted on investing her money into a business, without adequate knowledge about the business, even when her husband and friend refused to invest in the business. *Schwartz v. Goldstein (In re Goldstein)*, 105 B.R. 1016, 1017 (Bankr. S.D. Fla. 1989). The

25

creditor's insistence showed her blind faith in the debtor for which the debtor could not be held solely responsible. *In re Goldstein*, 105 B.R. at 1017.

A promise that sounds too good to be true is another red flag because it usually turns out to be just that – too good to be true. *U.S. v. Frykholm*, 362 F.3d 413 (7th Cir. 2004) (promise of 100 percent return in a month transparently too good to be true). *See also In re Curtis*, 2006 WL 1506209 at *10 (Bankr. C.D. Ill. May 24, 2006) (promise of 100 percent within 15 days was clear red flag).

Fourth, the creditors must prove that the creditors' reliance was the proximate cause of their losses. For purposes of § 523(a)(2)(A), proximate cause may be established by showing the conduct was a substantial factor in the loss, or the loss may be reasonably expected to follow. *Liberty Savings Bank, FSB v. McClintic (In re McClintic)*, 383 B.R. 689, 694 (Bankr. S.D. Ohio 2008).

*1. Creditor Daniel Geib's State Court Judgment*

Counts one and four of Geib's state court judgment against the debtor are for the initial $25,000 loan that Geib made in March 2012. The state court judgment amount for these counts is $22,871.53 at 10 percent from November 9, 2012. Counts two, three, five, and six are for the $10,000 loan in March 2013 and the $15,000 loan in June 2013. As explained more fully below,

26

Geib has only met his burden of proof for nondischargeability under

§ 523(a)(2)(A) for the initial $25,000 loan that Geib made in March 2012 –

*i.e.*, counts one and four of the state court judgment.

First, Geib proved by a preponderance of the evidence that the debtor

obtained all three loans from Geib through a material misrepresentation that, at the

time, the debtor knew to be false. The debtor told Geib that he had a confidential

and highly-successful financial formula for buying and selling stock options. In

fact, the formula was an unsuccessful, simple model created using

readily-available indicators from TradeStation. In addition, Geib proved by a

preponderance of the evidence that the debtor falsely represented his intention to

pay back the loans. Under the strict interpretation, none of these

misrepresentations is related to the debtor's financial condition because they are

not related to his overall financial health, net worth, or assets and liabilities.

Second, Geib proved by a preponderance of the evidence that the debtor

intended to deceive him. The debtor incurred the debts with the knowledge that

the debts were unlikely to be repaid. Even if he did intend to repay the debts, the

debtor still affirmatively misrepresented the nature of the model and the profit

potential of the model. He knew the true nature of the model and the unlikely

possibility that he would make enough money to repay the loans with the profits

27

from trading using the model. He was also aware of his financial situation and the other debts that he had incurred.

Skipping to the fourth element of § 523(a)(2)(A), Geib proved by a preponderance of the evidence that his reliance on the debtor's misrepresentations was the proximate cause of his losses. Geib showed that the debtor's misrepresentation was a substantial factor in his losses. Geib would not have lent the debtor the money if he had known the true nature of the model and the likelihood that the debtor would be able to repay the loan.

The third element of § 523(a)(2)(A) – justifiable reliance – is where Geib only met his burden of proof for the initial $25,000 loan – *i.e.*, counts one and four of the state court judgment. Geib had justifiable reliance when he made the initial $25,000 loan. The debtor had presented five years of back-testing that showed 24 percent returns and showed Geib how the model worked. The debtor's 30 years of experience in the securities industry far outweighed Geib's inexperience. Geib was just a successful businessman, unfamiliar with stock option trading. In addition, Geib had known the debtor for over ten years and had developed a friendship with the debtor. The debtor took advantage of this friendship and misused Geib's trust. In addition, in the first seven months that the debtor traded Geib's account, the debtor outperformed Geib's investment in a

28

multi-manager fund.  Still, there were minor red flags even when this first loan was made: the debtor's infrequent trading in the first seven months, the lower than predicted returns, and the debtor's financial troubles.  However, these red flags are not enough to defeat justifiable reliance for this first loan.  Geib justifiably relied on the misrepresentation when he made the first loan of $25,000.

As time went on, the red flags only increased in number and severity.  By the time Geib made the second and third loans to the debtor, Geib no longer had justifiable reliance.  Geib made these additional loans after the debtor had been trading his account for almost two years.  Geib testified that he was unhappy with the debtor's infrequent trading and low returns.  When Geib made the second loan of $10,000 in March 2013, the debtor had only made one trade in the first three months of the year.  When Geib made the third loan of $15,000 in June 2013, the debtor had only made one additional trade.  These were clear red flags that the debtor was not going to trade the model on a regular basis and generate profits to repay the loans.  In addition, the debtor was supposed to start repaying the initial loan in 2013, but he made no quarterly repayments.  The debtor's continued financial problems after receiving $50,000 in loans from the creditors in 2012 is another red flag.  Finally, McGinty's refusal to give the debtor more personal loans should have alerted Geib.  Geib had many warnings of the debtor's

29

deception but made no additional investigation. The Court concludes that Geib did not justifiably rely on the debtor's misrepresentation when he made the additional $10,000 and $15,000 loans.

Alternatively, Geib argues that the debtor made a misrepresentation when he failed to disclosed his prior loan from Cathryn Mooney. However, the debtor did not have a duty to disclose the loan from Mooney because the failure to disclose such information did not render a prior statement or representation untrue or misleading. Geib did not establish that the debtor told McGinty and him that they were his only creditors. In fact, Geib wrote in an email to the debtor and McGinty on March 8, 2012, that the loan would allow the debtor to "clear out his current debts and not have to worry about them." Mooney gave the debtor the alleged loan in March 2011, a year before the first loans from the creditors and over a year before the formation of Sheen Falls Strategies. Even if the debtor had the duty to disclose the loan, Geib did not prove that he justifiably relied on the debtor's failure to disclose the loan from Mooney. Geib knew the debtor had past debts and that the initial loans totaling of $50,000 did not solve the debtor's financial problems. These are red flags that Geib should not have ignored. Since Geib did not conduct a more substantial investigation, he did not justifiably rely on the debtor's failure to disclose the loan from Mooney. Accordingly, only the portion

30

of Geib's state court judgment reflecting his initial $25,000 loan to the debtor is nondischargeable under § 523(a)(2)(A).

### 2. Creditor Kevin McGinty's State Court Judgment

The analysis for three of the four elements for McGinty's loan is the same as Geib's loans. McGinty proved by a preponderance of the evidence that: (1) the debtor obtained McGinty's loan through a material misrepresentation that, at the time, the debtor knew to be false; (2) the debtor intended to deceive McGinty; and (4) McGinty's reliance was the proximate cause of the loss. The analysis for the third element, justifiable reliance, is different for McGinty.

Unlike Geib, McGinty had over 25 years of experience in institutional investing with major firms. However, his experience did not extend to stock options, so he still had less experience than the debtor. In addition, McGinty had seen models like the debtor's before where the trader just uses technical charts to make trading decisions. Despite this experience, McGinty did not recognize the debtor's model for what it was when he made his loan of $25,000. The debtor was secretive about the model and led McGinty to believe that there was more to the model than just the indicators. The debtor's deception hid the red flags that otherwise would have been apparent to someone with McGinty's experience and knowledge. As a result, McGinty did meet the relatively simple test of justifiable

31

reliance.  Accordingly, McGinty's state court judgment reflecting his $25,000 loan to the debtor is dischargeable under § 523(a)(2)(A).

### 3. Creditor Sheen Falls Strategies' State Court Judgment

Whether the company has established all the elements for nondischargeability under § 523(a)(2)(A) as to its own state court judgment is a difficult question.  The difficult element is, again, justifiable reliance.  It is a close call.  McGinty's knowledge and experience should be attributed to Sheen Falls Strategies.  Given the debtor's track record of infrequent trading, low returns, failures to repay loans, and McGinty's decision not to contribute additional personal loans, justifiable reliance for the company's August 2013 business loan would be hard to find.  However, the Court does not have to decide whether Sheen Falls Strategies had justifiable reliance on the debtor's misrepresentations regarding the formula, because the creditors have proven the elements of nondischargeability for embezzlement under § 523(a)(4) for the loan from Sheen Falls Strategies.  The debtor knew that the purpose of the loan was only for business, but he never used the money for its intended purpose.  The loan from Sheen Falls Strategies was unlike the previous personal loans that did not have the same obligations.

32

B. Nondischargeability under 11 U.S.C. § 523(a)(4) - Embezzlement, Larceny

Section 523 provides in pertinent part:

(a) A discharge under section 727. . . of this title does not discharge an individual debtor from any debt –
. . . .
(4) for . . . embezzlement, or larceny. . . .

Embezzlement is defined as the "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir.1996). "A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Bd. of Trs. of the Ohio Carpenters' Pension Fund v. Bucci* (*In re Bucci*), 493 F.3d 635, 644 (6th Cir. 2007) *quoting In re Brady*, 101 F.3d at 1173.

The degree of fraud required for embezzlement is fraud in fact involving moral turpitude or intentional wrongdoing, for the purpose of permanently depriving another of his property. *Cash Am. Fin. Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 116 (B.A.P. 6th Cir. 2007). Since a debtor is unlikely to admit to acting with bad motives, fraudulent intent may be shown through circumstantial evidence. *Id*. at 116. The court may be aided in its subjective analysis by the presence of traditional indicia of fraud – "e.g., suspicious timing of events,

33

insolvency, transfers to family members or other insiders." *Automated Handling*

*v. Knapik (In re Knapik)*, 322 B.R. 311, 316 (Bankr. N.D. Ohio 2004). The court

should review the circumstances surrounding the case and determine "whether all

the evidence leads to the conclusion that it is more probable than not that the

debtor had the requisite fraudulent intent. *In re Rembert*, 141 F.3d at 282.

For embezzlement, the creditors may establish circumstances indicating a

debtor's fraudulent intent, even if the debtor did not make a misrepresentation or

misleading omission on which the creditor relied. *In re Fox*, 370 B.R. at 116.

As a result, the creditors do not need to demonstrate justifiable reliance to prove

"fraud in fact" under § 523(a)(4).

For purposes of § 523(a)(4), larceny is defined as "the fraudulent and

wrongful taking and carrying away of the property of another with intent to

convert such property to the taker's use without the consent of the owner."

*Graffice v. Grim (In re Grim)*, 293 B.R. 156, 166 n.3 (Bankr. N.D. Ohio 2003).

The original taking of the property must have been unlawful. *See Schreibman v.*

*Zanetti-Gierke (In re Zanetti-Gierke)*, 212 B.R. 375, 381 (Bankr. D. Kan. 1997).

### 1. The Remaining Counts in Creditor Daniel Geib's State Court Judgment

Geib has failed to establish that his two additional loans were used for a

purpose other than that for which they were entrusted. Geib's loans of $10,000

34

and $15,000 were personal loans to the debtor with no conditions on how the money would be spent. The debtor had no obligation to spend the money for business purposes. The debtor's gift of $17,000 to his daughter around the time of her marriage in June 2014 was after the money was already loaned. Nothing in the testimony or exhibits establishes that there were any restrictions other than that the money had to be paid back. Geib has not proved by a preponderance of the evidence that the debtor agreed to use the money for only specific purposes or that the debtor had to report to the creditors if he used the money for something else.

Geib has also failed to establish that the debtor wrongfully took or carried away property that belonged to Geib with intent to convert such property to the debtor's use without Geib's consent. Geib voluntarily loaned the debtor the additional $10,000 and $15,000 without any stipulations as to how the proceeds must be spent. Accordingly, Geib has failed to establish by a preponderance of the evidence that the portion of his state court judgment reflecting his two additional loans to the debtor is nondischargeable under § 523(a)(4).

2. *Creditor Sheen Falls Strategies' State Court Judgment*

The $50,000 loan from Sheen Falls Strategies to the debtor was explicitly for "business purposes" only. The debtor knew that the purpose of the loan was only for business, but he never used the money for its intended purpose. Instead,

35

the debtor spent the money on personal expenses. The circumstances of the loan also indicate fraud. The debtor purposefully deprived Sheen Falls Strategies of its property when he solicited the loan. The company proved by a preponderance of the evidence that the debtor did not intend to use the loan for business purposes. The company also proved that the debtor lacked the intent to repay the loan. In addition, the debtor misrepresented the nature of the model and its ability to generate profits. Accordingly, the state court judgment in favor of Sheen Falls Strategies is nondischargeable pursuant to § 523(a)(4).

## II. Additional Monetary Relief

The creditors ask this Court to enter a money judgment for the amount of debt that is nondischargeable; however, the creditors already have the three state court judgments described above. To the extent that the creditors also seek a separate money judgment from this Court, that relief appears to be barred under principles of Ohio claim preclusion law. The creditors' request for attorney fees and additional costs merged into the state court judgment, at least to the extent these fees "were or could have been litigated" in the state court. *See Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 703-04 (6th Cir. 1999) (listing four elements of claim preclusion in Ohio including requirement that claims "were or could have been litigated in the first action"); *see also Brown v. Felsen*,

36

442 U.S. 127, 131 (1979) (finding that claim preclusion applies in bankruptcy to bar claims that should have been brought in state court action but does not bar litigation of issues related to dischargeability); and *Grava v. Parkman Twp.*, 73 Ohio St. 3d 379, 382, 653 N.E. 226, 229 (1995). Accordingly, the creditors' request for additional monetary relief beyond the existing state court judgments is denied.

## CONCLUSION

For the reasons stated above, the Court enters a final judgment as follows: 1) the portion of creditor Daniel Geib's state court judgment reflecting his initial $25,000 loan to the debtor is nondischargeable under § 523(a)(2)(A), but the balance of Geib's state court judgment reflecting Geib's two additional loans to the debtor is dischargeable; 2) creditor Kevin McGinty's state court judgment against the debtor is nondischargeable under § 523(a)(2)(A); and 3) creditor Sheen Falls Strategies' state court judgment against the debtor is nondischargeable under § 523(a)(4).

IT IS SO ORDERED.